Thank you, your honor. Good morning. May it please- Good morning. Hunter Hayes here, pro bono counsel on behalf of the petitioners. I would like to reserve if possible three minutes for rebuttal. Right. I represent the petitioners Blanca Vasquez-Dominguez and her son Jorge. Blanca and Jorge were the subject of a death threat to murder them on a particular day. They fled their country, El Salvador, before the expiration of their deadline to leave. Along with Blanca's other two sons, Brian and Nason. Brian and Nason have won asylum and will be permitted to stay in the United States, will not be required to return to El Salvador. Well, let me ask you about those. Somehow, my understanding is they were separated from the other three people in the family and they came in as unaccompanied minors. And so that they kind of took a different path. Is that correct? That's correct. The family was separated by mistake while they were traveling in Mexico. So the two sons were designated unaccompanied minors. USCIS took jurisdiction of their case and granted them asylum. So we know that they will not be required to return to El Salvador. And the question here is whether Blanca and her youngest son will be required to return and face the threat. So I submit that the BIA was clearly aired. And you're not arguing that just because two other people got asylum in the family, that it's race judicata or collateral estoppel or something like that, that automatically these two individuals get it. You're not. We have to deal with this case on the merits, correct? That's correct, Your Honor. I mean, it's a heart tugging situation, but we still have a job to do, correct? That's correct, Your Honor. I pointed out only to make the point that the court need not be blind to the human effect of this case. But there's nothing in the record indicating the basis for USCIS' asylum grant there?  We do know, however, that Blanca and her three sons were at home when the gang came to their home and threatened to murder the family. And they left together. And we know that Blanca's sons were minors at the time. So let me ask you about a hypothetical regarding family as social group. Let's suppose, and this is a hypothetical, it has nothing to do with this case. It's an entirely hypothetical case. And suppose that someone in the family is a dope dealer. And suppose they get into a dispute with their supplier. The supplier says, I'm going to kill you if you don't pay me. Although that's a serious threat to kill by somebody who's likely to kill, that's not persecution on any of the five grounds in the statute. Is that right? That's right. That would not be persecution against the drug dealer. That's correct. And that's because it's not because of political opinion or religion or family or ethnicity or anything, right? That's correct, Your Honor. The statute doesn't say family. It says social group. Now, let's say that the supplier says, I'm going to kill your whole family. It's exactly the same reason. It's that the dealer didn't pay his supplier. And this is the supplier's collection method. As I understand the logic of your case, even though the drug dealer in the family would not be entitled to asylum for one of the statutory reasons, the other family members would be entitled to asylum for a statutory reason, because the only reason they're in jeopardy and they're in serious jeopardy is the threat to another member of their family who is the drug dealer. Have I got your argument right? Well, Your Honor, two points in response. I would say not necessarily. We know that each asylum case is judged on its own merits based on the totality of the circumstances. That's why I told you it's a hypothetical. I know that there's no drug dealing at issue here. I'm just trying to clarify what the targeting of other family members means in terms of persecution on account of social group. There. What I'll say primarily, Your Honor, is that the question of nexus and the question of social group is not before the court this morning because the BIA didn't rule on it. So in order to make a ruling on the nexus question, the court would first remand the BIA to address that question in the first instance. You've got to deal with the persecution first. You've got to deal with that particular act. We have to deal with that particular act. And if that particular act doesn't get you anywhere, then you don't get to the next stage. So in order to get a remand, you would have to be able to, you've got to be able to establish that that's persecution, right? Precisely, Your Honor. And the record here compels a finding that what happened in El Salvador was either past persecution or at the very least raises at least a 10% chance that this family will be harmed if returned to El Salvador, that they'll be killed if returned to El Salvador. So the past persecution is established on this record. We know this court has repeatedly confirmed that a death threat standing alone can, under certain circumstances, constitute persecution. And there have been discussions in the cases about that, that that threat has remained alive, that the death threat without any violence can constitute persecution. Of course, that's not what we have here. What we have here is a death threat accompanied by, a very close in time, the murder of a very close family member. Well, okay, and then they leave. They leave right, they leave with, before the age of 18. So if we, I think we recognize that MS-13 is still pervasive in El Salvador, but the record shows that the government is taking steps to counter them. Why does this record compel a finding that the government is unwilling and unable to control them when your clients basically took off and there is, there are things in the record that they're making progress on? My clients, Your Honor, I respectfully disagree that they took off right away. The death threat was murder the family in eight days. They were told that they would be murdered on a specific date. They went to the police and they sought the police's protection. The police took a report, but did not offer any protection. I'm not aware of a case in which this court has held that where the... I don't think they checked with the police to see if the police were doing anything. I think they assumed the police were not doing anything. And frankly, I don't understand the eight days. I can understand saying, you have the money tomorrow or you're dead. And I can understand you better get the money or you're going to be dead with an uncertain amount of time. And I just don't understand an eight day threat. Was something about to happen in eight days? The record doesn't give any particular importance to the fact of eight days. I will point out that the IJ made a finding that the petitioner's testimony was credible. And so the eight days has been established on the record. I'll also point out as a matter of the general timeline here, Jorge Blanco's petitioner's partner publicly repudiated the gang in the town square. He received a vague threat. Shortly after that, Julio Milton, the close family member, is murdered. Jorge sees the gangsters fleeing the scene of that crime and they see... Incidentally, did they flee within eight days or did they flee subsequent to the eight days? It's very clear they fled within the eight days. They fled approximately the eighth day. They fled before the expiration of the gang's deadline. And that's why no action was taken against them. We see that the BIA focused on the fact that other members of the family haven't been harmed. And the... What was the point? I didn't really understand this in the record. What was the point of you better be out of here in eight days? The landlord says that. You've got to be out in 30 days or whatever the time limit is on an eviction. But usually what gangs want is money. I don't understand what the point was of saying be out of here in eight days. It's like all you have to do is be out of here. But I think that draws attention to the fact that money may not have been the primary purpose here. But the gang knew that Jorge had witnessed them fleeing the scene of a murder. Knew that he could potentially be a witness against them. And knew that he had publicly repudiated the gang in an act of defiance. I don't think there's anything in the record saying that the reason they were scared of the gang is that the gang targeted them as potential witnesses. I think that's just speculation, isn't it? Or did I miss it? No, I don't think it's speculation, Your Honor. The Blanca Predators... Is there something in the record about it? But what's in the record is that the gang saw Jorge seeing them flee. I'm asking a slightly different question. I'm asking, did they say the reason that they fled was that they feared being targeted as witnesses? The gang didn't make any specific comments of that effect here, Your Honor. I'm asking about the asylum seekers. Vasquez Dominguez. Did she say that the reason she fled is she feared being targeted as a witness? I thought she said that the reason she fled was that the gang said they'd kill her if she wasn't gone in eight days. Precisely, Your Honor. I'm just... I'm not sure that those two things are mutually exclusive. She fled El Salvador because she was concerned... Well, they're different in the sense of one seems to be supported by the record and the other not. And I'm trying to make... To get it clear in my head which one is and which one isn't, or if I just missed the fact that both are. The specific statement in the record is that Blanca fled El Salvador because she was concerned about being murdered. Now, Blanca testified that Julio was killed because he was not paying the extortion for himself. Is that correct? That's my reading of the record. Right, Your Honor. She testified that Julio had at some point stopped making the payment. I will point out, Your Honor, though, that my client, Blanca, petitioner, was not present when her partner, Jorge, had publicly repudiated the gang. So she did not have personal knowledge of that act of defiance that came very shortly before Julio was murdered. I think someone's moving papers by a microphone. It's giving us a little feedback here. That was me, sorry. All right, thanks. And the closeness in time there, the clarity of the timeline here, provides a strong evidence that Julio may not have been murdered solely because he stopped paying the gang. He may have been murdered because of his connection to his partner, to his cousin, who had publicly repudiated the gang. Mr. Hayes, my difficulty is the standard of review. Am I right that we would have to say that the record compels an opposite conclusion and that record is one of a single threat, albeit very dire, made indirectly? That is to say, two people that were refusing to pay, increasing extortion. What's your best case where the Ninth Circuit, and best and closest, where the Ninth Circuit has reversed on this type of fact determination? I would point the court to the case of Salazar-Paukar, in which the applicant had received death threats and had received... Plural? I'm sorry? Plural? Yes, Your Honor. But allow me to make a point, and I see that I'm running low on time, but allow me to... So answer the judge's question, okay? That's what I want you to do first. Yes, Your Honor, thank you. The point of a single death threat versus multiple death threats is not the critical question here. The critical thread through the death threat cases is whether the threat received was credible, whether this was something that the applicant had a reason to believe would be carried out. And if so, then the death threat causes harm that can suffice to reach persecution. Having received multiple death threats, if anything, reduces the credibility of any single death threat. Here, we knew that Blanca knew, if I don't leave within eight days, I will be murdered. And that persecution does not rise if there is an additional death threat. Okay, thank you. Thank you. All right, unless my colleagues have questions, why don't you reserve the balance for rebuttal? But I'll give you two minutes for rebuttal, since we asked you some questions. Okay, thank you. All right, we'll hear from the government. We're not hearing you. I don't know what's... You're kind of frozen here. Um, sorry, I forgot to hit the mute button. I apologize for that. They don't teach that in PhD programs or law school. So I apologize for that. No, no, they do not. Yeah. Okay, may it please the court, the government, we certainly don't intend to minimize the... Can we state your appearance for the record, just so we have that? Sure. Robert Penison for the government. Thank you. Oh, absolutely. The government doesn't want to minimize the death threat here by MS-13 to the petitioner's October 29th of 2015. Counsel, as you know, I'm sort of thinking ahead to whether families and social group, if we were to affirm on the basis that there was no serious threat here, of course, you don't get to that. It would be remanded, as your opposing counsel says. But let me ask you something about the death threat. I don't understand why getting one threat from somebody who is the kind of person who may kill you isn't enough to have a well-founded fear that you're going to be killed. A death threat from somebody who you don't think is very threatening, that's not serious. But a death threat from somebody who's the head of a murderous gang, and he reminds you that they've already killed somebody else. I don't understand why it takes more than one to create a well-founded fear. Okay. So I think we're not talking about this as being past persecution. We're talking about it as being a question of future persecution, and whether or not, even if the threat is a credible one, whether or not it's something that's going to be carried out against the petitioner here. I think one of the things that the board was very focused on was that the threat is against Jorge for not complying with its extortionate demands. There's no indication that previously the petitioner herself had ever been targeted by the gang, or that they were particularly interested in her, except as, say... Well, it's useful as a collection technique. It was purely a collection technique. But that's kind of an effective technique. It's like, well, gosh, I guess if I got a threat from one of my wife's colleagues at the university, I wouldn't take it seriously. I'd figure it was just joking or silly talk. And if I got a death threat from, well, I guess it happens to all of us from time to And here, even though the threat is not because of her conduct, it's a common collection technique to say things will be bad for your family if you don't pay. Even that's for illegitimate and also legitimate claims. Right. I mean, Your Honor, I completely understand. That's right. And it is. But at the same time, we have to remember that it's focused on him. And that it's not Jorge's being removed. It is the petitioner being removed by herself. And the question is whether or not she will be targeted in the future based upon the threat to him. And so if he doesn't go back, and this is one of the things the board, I think, emphasizes that if he isn't going back, right, it's a threat to her and whether or not they've been looking not just for him, but they've been looking for her and whether she needs to fear the reprisal of the gang. If she goes back apart from the petitioner. And if you get a death threat from a killer, you get a death threat from a killer, you lose some sleep. And that's past persecution. And you also fear you're going to get killed. That's the well-founded fear part. And if he's home free and he's gone, it seems like, well, I don't see why that makes it less threatening for her if she goes back. She's the only one there they've got available to kill in that case. Right. I think one of the things that the evidence here showed is that the gang is really interested in targeting people who actually can pay the extortionate amount. They don't really care about people who don't have money. And so the board could reasonably conclude based upon that and upon the fact that she hasn't been personally sought out by the gang. Suspect went to leaving. There's no firm evidence that the gang saw her after she left. Based upon that, at the very least, the board could reasonably conclude. It wasn't compelled to conclude this, but it could reasonably conclude that that threat didn't raise a concern about future persecution. And with regard to the past persecution issue, remember, typically death threats are not found by this court to be indicative of current persecution. They're indicative of future persecution. I know on that point, I wanted to ask you a question. The death threats may constitute past persecution where they are so menacing as to cause significant actual suffering or harm. I was wondering what is your position on the amicus's argument that the PTSD resulting from a death threat may constitute such suffering and harm? And if you agree, why do you think there was no showing of such here? Right. I don't think the court needs to get into the question as to whether or not PTSD is necessarily going to be in all cases sufficient to satisfy the actual or the significant actual harm or harassment that's required under LEM. Because here, the petitioner never testified to those kinds of things. I think at best, we may have a comment from her that she was more worried or that she felt terrorized, but we don't have any testimony about what that meant. Was she upset? Could she not sleep for nights? Did it affect her ability to think clearly? To reason? There are a variety of physical manifestations or emotional manifestations that she could have testified to of how the threat affected her that we just don't have. Let me ask you this, Ben, though. Okay, so you have the asylum standard and you have the withholding standard. And they're not the same. So under the withholding standard, it requires a likelihood of future persecution. Asylum requires only a reasonable possibility. And I think your counsel for the petitioner mentioned our cases say that even a 10% chance is sufficient. So why did the death threat not create even a reasonable possibility of persecution? Even though you argue that the killings of Marcos and Julio were unrelated, don't they at least show that MS-13 would be quite capable of murdering Blanca and her child who were included in the threat? I mean, I think that that's probably, that goes more to future persecution than to the current persecution. I don't think that that gets us over the hurdle as to whether or not it's sufficient, the threats were sufficiently menacing. Don't forget, she was not directly threatened. And in fact, imagine Jorge had never told her about the threat. Jorge takes the phone. He answers it. He hears the threat and he never says anything. So the question is, is that a death threat to her? It seems that only if El Sicario, I believe is the name of the gang member who threatened the petitioner's partner. Only if he had said... Which means assassin. Which means assassin. Assassin, right. Right, which means assassin. I mean, we've all seen the Sicario movies, or at least watched Sicario movies. Right. That he, that if he had said, go and tell her, maybe that threat gets directed at her. But here the threat isn't directed at her. It's directed at Jorge, right? So he could have kept his mouth shut and we wouldn't, we wouldn't have this case. There is this intermediary that needs to operate and there's no instruction to the intermediary, tell your family. Or at least there's no testimony to that along those lines. What's the story with Jorge right now? My understanding is he's in Texas or something like that. No one's looking for him or what's going on with what? I have no idea. The last, the only thing I know from the record is at the time of the testimony, he was somewhere in Texas because he couldn't, because he feared living with the petitioner because ICE would pick, because he, he was afraid ICE would pick him up. He has, if I read this correctly, he has three expedited, you know, orders of expedited, expedited removal orders. And so his fear is that, you know, he would be removed as soon as he was, he was picked up. That the expedited removal orders would be reinstated and that would be the end of that. So that would be my, yes, your honor. I have three quick questions. One is, does future persecution case law take into account at all the amount of time passed? That's the first question. In other words, about six years here. The second question is, you heard us asking opposing counsel, does the BIA in this record give no weight to the fact that two other family members did get asylum granted? And the third question is, do you know whether the Department of Justice's position on single death threats is a consistent position across the circuits as to when a single death threat can suffice? Did you keep those three questions down? Okay. So I've got two and three pretty clear in my head and number one is about the time. So I don't have a good answer for you on time, but I would suspect that the time between the prior threat and when the individual is at their hearing or facing possible removal. So at that time, she had left and they left in early November of 2015. The hearing was sometime in, it was somewhere in, I believe, mid 2017. So that's about a two year period that we're talking about there. But I would think that it comes in, especially if subsequent to leaving, there's not been any indication that, for instance, the gang is continuing to look for them, right? So time does matter because otherwise we wouldn't care whether or not the gang is looking for them. Thank you. Second question. As far as the second question goes, yeah, it is sort of, I would say that it is kind of ostensibly worrying or seemingly unfair that you have two asylum members or two family members who've been granted asylum and one who doesn't, right? That is troubling. But at the same time, there are reasons to explain why that could be the case. I mean, first, we don't know what the petitioner's children argued. We don't know the basis of their asylum claims, clearly. We don't have copies of their asylum applications. It couldn't have been her son here, right? We're talking about three sons. We're talking about three sons. But it's possible if, for instance, if you look at the report of the expert, Ms. Kennedy, one of the things that she talks about at length is, and it's clear that that declaration has to do with the two sons, not directly with the petitioner here, that that in addition to the other aspects of the claim. So there may have been a gang recruitment angle as well. There may be other facts. And finally, it's worth noting that the law treats harm to children, especially in the Ninth Circuit, treats it differently than, as far as past persecution or future persecution goes, differently than it treats harm to adults. We sort of take a 10-year year's look to threats and suffering and things like that with respect to children. And then I finally note that the petitioner hasn't presented any specific claims with regard to any due process claim or any claim like that, that the circumstances of the children were the same as the mother. And therefore, there's some, you know, that this is arbitrary or capricious or there's some violation of due process in the two and then being treated differently. And then finally, your third question as to whether or not we're consistent about the Department of Justice is consistent in its position on death threats. I have a feeling that sort of how we argue death threats to a large extent has been determined by how the circuits have gotten out in front of the question or how they've resolved the question. So say, for example, in the Fifth Circuit, you know, there are several, and I'm not sure with regard to death threats, but there is this body of law that talks about persecution requiring this sort of systematic, you know, having a systematic and- Okay, focused on the knife, I was just curious if death threat always needs some ingredient axed, violence repeated, but you've given me a lot of time. So I'll let you, I've taken time. Thank you. All right. Thanks. No, I think you've sort of allowed me to sort of talk about a various number of things that I wanted to get into. I think basically what I'd like to close on is the future persecution question. Petitioners are, the government found that there was no future persecution, right? No, what? Well, that the Salvadoran government wasn't unable or unwilling to protect the petitioner and substantial evidence does support that. First, even though the petitioner did, the petitioner did try to file a report, did file a report, the petitioner makes something of the fact that they never heard anything back, but they didn't seek a response on the report while they were there and they haven't sought a response subsequent. It's not as though they reached out after they came to the United States and said, what happened to the report? We just don't know. We don't know if they dropped the ball. We don't know if they just ignored it. We just don't know. Second, there is plenty of evidence in the record to support the determination that this is that the Salvadoran government would be willing and able to protect her. Among other things there on the willingness side, there's certainly an abundance of evidence with regard to creating special units to prosecute, to go after gangs or prosecution. Unless my colleagues have questions, I'm going to ask you to wrap up in a minute. Right. I'm just going to say, just let me say that, you know, prosecutions and police officers. And then finally, as far as the effectiveness, which seems to be the big issue, there are a number of New York Times articles, a CNN piece, a CRS report all on the record that all indicate that beginning at the middle to end of 2016, the gang violence problem began to subside, or at least the number of killings began to subside in El Salvador. That perhaps they began to turn a corner on this and that the willingness of the government to pursue the gangs was actually turning into effectiveness as well. And if the court has no further questions for me, the government will rest. Thank you. Thank you. Do any of my colleagues have any additional questions they want to ask of Mr. Tennyson? Okay, thank you. All right. Mr. Hunter, I gave you two minutes. And Mr. Hayes, I'm sorry. Mr. Hunter Hayes. I'll take the last point first. This court has never required an asylum seeker to prove that once the police denies protection, the asylum seeker is required to then follow up and check whether the police are still denying protection or whether circumstances have changed. Did they deny protection? I don't, I didn't remember that if it's in the record. What I recalled from the record was that the family had reported the threat to the police, which itself suggests that they imagined that the police would do something about it. And then the police took the report and the family left before the eight days and there was no subsequent to the report contact with the police. Have I got that wrong? No, you've got that right. And if I'm going to the police and telling them that... So why are you saying that the police denied or refused to respond when the record doesn't say that? I won't fall on the point of the police denied protection. That maybe isn't an artful word. We know that the family requested that the police look into this threat to kill them on a specific... I don't care about artfulness. I care about true. And what I want to know is that the police refused to do anything or not? I would argue that the police refused to do anything by not taking any action in response to a credible death threat on a specific... How do you know they didn't take any action? And how can you say they refused? I mean, usually when the police are doing something, they're not having the victim of the crime in the police station tracking the whole affair. If the police are offering protection, then it absolutely would require the victim of the crime to be involved. If the police are going to protect against a death threat, then Blanca would be aware that the police had done something because the police would have reached out. I would like to make one more point, which is on the point of future persecution. And it is critical here that nothing has changed in El Salvador that would limit the likelihood that Blanca and her children will be murdered in El Salvador. The gang did not threaten the people who remain in El Salvador unharmed. The gang did not need to look into whether Blanca was still around for them to persecute her. They told the family to leave. The family left. Their home was empty after that date. It makes sense that they're not going around and trying to find out where they are. They're gone. We know that if they return to El Salvador, there's a strong reason to believe at least 10% that they will suffer persecution in the future. All right. Thank you both for your argument. I'd also like to thank, we thank everyone for coming prepared. However, we always like to thank people that are willing to do pro bono work in cases because it makes it easier for the court to decide these difficult legal issues. So thank you for doing pro bono work. I realize it wasn't part of the court program, but we're happy when our legal community steps up and helps individuals. Thank you. I'm honored, Your Honor. All right. That will conclude this matter and it will be submitted at this time. Thank you.
judges: Higginson, Kleinfeld, Callahan